Frank DIBENEDETTO, Petitioner, Appellant,

v.

Timothy HALL, et al., Respondents, Appellees.

No. 00–2279.

United States Court of Appeals, First Circuit.

Heard Sept. 7, 2001.

Decided Nov. 16, 2001.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 3, 2001.

Wendy Sibbison, for appellant.

William J. Meade, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellees.

Before BOUDIN, Chief Judge, LYNCH, Circuit Judge, and DICLERICO,* District Judge.

LYNCH, Circuit Judge.

Frank DiBenedetto appeals the district court's denial of his habeas corpus petition challenging the constitutionality of his state conviction for a double homicide more than a decade ago. *See Commonwealth v. DiBenedetto,* 427 Mass. 414, 693 N.E.2d 1007 (1998). He is serving a life sentence.

DiBenedetto presents two claims, arguing that the determination of the Massachusetts Supreme Judicial Court (SJC) on these issues is in error on de novo review and, additionally, that it was contrary to, or an unreasonable application of, clearly established Supreme Court rulings of constitutional law. 28 U.S.C. § 2254(d) (Supp. II 1996). DiBenedetto's first claim is that the trial court's refusal to allow him to present evidence that he believed would undermine the key witness for the prosecution violated his rights under the Sixth Amendment of the United States Constitution. His second claim is that the prosecution's testing, resulting in the destruction, of physical evidence that may have been exculpatory violated his rights under the Sixth and Fourteenth Amendments. In addition, his case raises questions about the standards by which federal courts ruling on state prisoners' habeas petitions review state court decisions that do not, apparently, decide the federal constitutional claims raised.

* Of the District of New Hampshire, sitting by designation.

We affirm the denial of habeas relief, aided by the very helpful decision of the district judge, and, in light of an intervening decision of this court, clarify the standard of review to be applied to state court decisions under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, when the state court does not decide the federal constitutional claim.

## I.

The petitioner DiBenedetto was charged with the 1986 murders of Frank Chiuchiolo and Joseph Bottari. All reportedly had connections to the La Cosa Nostra organized crime group. The bodies of the two victims were found in a park in Boston's North End. Chiuchiolo had been shot seven times, including five shots to the head, and Bottari had been shot sixteen times, including six shots to the head. Each had been shot by three separate guns. DiBenedetto was tried jointly with codefendant Louis Costa, while a third individual, Paul Tanso, was tried separately. The jury found DiBenedetto guilty of two counts of first degree murder on charges of deliberate premeditation and extreme atrocity and cruelty. Costa was also convicted of first degree murder, while Tanso was acquitted.

The prosecution's evidence against DiBenedetto consisted primarily of: 1) the testimony of Richard Storella, a fully immunized witness who claimed to have been present at the shooting and involved in luring the victims to the scene; 2) the testimony of Joseph Schindler, a lawyer, who observed the shootings from the window of his third floor apartment overlooking the park; and 3) DiBenedetto's sneakers, one of which had trace amounts of something that may have been human blood. DiBenedetto's arguments on this appeal relate to the first and third pieces of evidence.

Storella's testimony was key to the prosecution's case. Storella testified that he and the victims had agreed to rob DiBenedetto, a drug dealer and one of Storella's best friends, of cocaine. The plan was for Storella to arrange a buy, and the two others to show up and rob DiBenedetto. Storella says he later decided to inform DiBenedetto of the planned robbery and DiBenedetto instructed him to set up the buy as planned. When the victims arrived at the park intending to rob DiBenedetto, DiBenedetto and his accomplices were armed and waiting to gun them down. Prior to the trial, Storella had given various inconsistent statements to the police, in depositions, and to the grand jury, including one statement where he confessed to being the killer himself. However, in all Storella's versions except his initial denial of any knowledge of the shootings, DiBenedetto was one of the shooters.

DiBenedetto's claim is that he was unconstitutionally precluded from introducing evidence of the defense theory that he was being set up by Storella to take the fall for a mob hit, and that Storella, despite being immunized, was lying in order to "curry favor" with lead players in the La Cosa Nostra, whom Storella had previously angered. More specifically, DiBenedetto's theory was that these killings were "fallout" from the mob-ordered murder of Vincent Limoli, three and a half months prior to the killings at issue here. Limoli, like the victims here, was shot during what was set up as a drug purchase in the same section of the North End. *See United States v. Barone*, 114 F.3d 1284, 1289–91 (1st Cir.1997) (describing Limoli murder). He argues that the Limoli murder was retribution for Storella and Limoli's robbery of a "made" mob member in 1985 and that the two victims in this case had an-

gered the La Cosa Nostra leadership over their actions in connection with the Limoli murder: Bottari by refusing to act as Limoli's executioner, and Chiuchiolo by breaking the code of silence to tell his sister (Limoli's girlfriend) details of the killing. DiBenedetto claims that the two victims were killed by the La Cosa Nostra in retaliation for their disobedience, and that Storella, fearing for his own life due to his involvement in the robbery that precipitated all this, was under mob orders to cover up the real story behind the killings. He argues that the trial judge violated his constitutional rights by not allowing him to present evidence of, or cross-examine Storella regarding, the Limoli murder fallout theory.

The sneakers, along with the claimed evidence of blood, form the basis of DiBenedetto's second habeas claim. The witness Schindler had identified the shoes as the ones DiBenedetto was wearing at the shooting. For years following the arrest, the Commonwealth maintained that there was no evidence of blood on the sneakers, and so the prosecution would not use them as evidence. This was the prosecution's position in the pretrial conference report. Less than a week before the second trial was scheduled to begin, on New Year's Eve day, the prosecution conducted its first swab test on the sneakers, which resulted in a positive result on the left sneaker, indicating a small spot of "what was either the blood of a human or some other animal or perhaps certain plant peroxidases." *DiBenedetto*, 693 N.E.2d at 1011. In the process of testing, the sneaker was cleaned of any trace of blood. DiBenedetto's experts were unable to replicate the test on the left sneaker, but did obtain a positive swab result on the other shoe, where the prosecution's swab test had found nothing. The challenge to the sneaker evidence has two components. First, DiBenedetto argues that the test,

conducted in violation of the pretrial conference report, violated his due process rights. Second, he argues that the sneakers were exculpatory evidence which the prosecution did not take sufficient steps to prevent from becoming contaminated and destroyed in the process of testing.

II.

This case has been to the SJC twice. On DiBenedetto's first appeal, the SJC reversed the murder conviction because the witness Storella had been unavailable to testify and the trial judge erroneously admitted his recorded testimony as evidence against DiBenedettto. *Commonwealth v. DiBenedetto*, 414 Mass. 37, 605 N.E.2d 811, 815–16 (1992). At DiBenedetto's second trial, Storella did testify and DiBenedetto was again convicted of murder in the first degree. DiBenedetto again appealed to the SJC, presenting the claims that he presents here on habeas, as well as many additional claims not argued here. The SJC affirmed the conviction, albeit apparently without considering either claim as a federal constitutional claim. *DiBenedetto*, 427 Mass. 414, 693 N.E.2d 1007 (1998).

On the exclusion of evidence concerning the Limoli murder, the SJC affirmed the trial court's conclusions that, as a matter of state law, the Limoli killing was too remote to be relevant and that the evidence was too complicated and would divert the jury's attention. The SJC concluded that DiBenedetto had proffered no evidence, other than speculation, that anyone else had a motive to kill Chiuchiolo and Bottari, or to show that the murders were sufficiently similar. Similarly, the SJC concluded that the trial judge did not abuse his discretion in barring cross-examination of Storella regarding the Limoli murder and his alleged fear of retribution

from the La Cosa Nostra. The SJC did not discuss the Sixth Amendment implications of these decisions.

With regard to the admission of the evidence indicating the possible presence of blood on one of DiBenedetto's sneakers, the SJC relied on its precedent in *Commonwealth v. Willie*, 400 Mass. 427, 510 N.E.2d 258 (1987), which held that "when potentially exculpatory evidence is lost or destroyed, a balancing test is employed.... The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." 510 N.E.2d at 261. Based on this balancing test, the SJC held that there was "no doubt that the Commonwealth failed to comply with the pretrial conference report," but that DiBenedetto "failed to demonstrate that [he was] prejudiced by [the] testing of the sneakers for blood." *DiBenedetto*, 693 N.E.2d at 1011. Again, the SJC decision cited only Massachusetts judicial decisions and did not discuss the federal constitutional claims that were raised.

## III.

Under the standard established in AEDPA, a habeas petition may not be granted "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision: 1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or 2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (Supp. II 1996). A state court's findings on factual issues "shall be presumed to be correct" and the petitioner bears the burden of disproving factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e).

In this case, the proper application of the AEDPA standard warrants further discussion. In the district court, DiBenedetto argued that, because the SJC's decision does not discuss DiBenedetto's constitutional claims or federal constitutional case law, these claims should be reviewed de novo by the federal courts. The district court rejected this argument.

■ The district court cited to 28 U.S.C. § 2254(d)(1) stressing the words "resulted in" and "involved" to support its conclusion that the state court's ultimate holding, not its rationalization process, is what matters under AEDPA. *DiBenedetto v. Hall*, No. 99–10843, slip op. at 9 (D.Mass. Aug. 25, 2000). It is correct that when the state court has addressed the federal constitutional issue, it is its ultimate outcome, and not its rationalization, which is the focus. *See Hurtado v. Tucker*, 245 F.3d 7, 20 (1st Cir.), *cert. denied* —— U.S. ——, 122 S.Ct. 282, —— L.Ed.2d —— (2001). But that does not mean the deferential standard applies where the state court has not addressed the constitutional issue.

In our view, the critical point is the preceding clause in the statute, which states that the deferential standard used applies to *claims* that were "adjudicated on the merits" in the state courts. 28 U.S.C. § 2254(d). If the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues), then we cannot say that the constitutional claim was "adjudicated on the merits" within the meaning of § 2254 and therefore entitled to the deferential review prescribed in subsection (d). This was the holding of our recent decision in *Fortini v. Murphy*, which forecloses the district court's approach here. 257 F.3d 39, 47 (1st Cir.2001) ("[W]e can hardly defer to the state court on an issue that the state court did not address."); *accord Hameen*

*v. Delaware*, 212 F.3d 226, 248 (3d Cir. 2000) (applying pre-AEDPA independent review of constitutional claim where state court decision rested on state statutory construction), *cert. denied*, —— U.S. ——, 121 S.Ct. 1365, 149 L.Ed.2d 293 (2001).

 Faced with state court opinions that do not decide constitutional claims raised by the defendant, the *Fortini* approach requires that federal courts apply de novo review to the federal constitutional claims raised in habeas petitions.

 Because the SJC chose to decide both issues on state law grounds, we review both de novo.[1] As to the first claim, we particularly note that the Commonwealth, arguing that the SJC findings that the Limoli murder was too "remote" and not "sufficiently similar" are state law determinations,[2] has taken the position that the state rule is an independent rule to which we must give deference. Taken to its logical conclusion, this argument confirms that the SJC discussion of the evidentiary claim does not address the federal rule, even implicitly.

## IV.

The first question is whether the trial court's decision to exclude evidence supporting a defense theory was in error as a matter of federal constitutional law.

1. Whether or not the state court has decided the federal claim on the merits, any factual determinations that it makes—even if they relate solely to an independent state claim—remain entitled to the presumption set forth in 28 U.S.C. § 2254(e)(1) insofar as they may be useful in consideration of the federal claim. In some cases, the outcome of the federal claim may be determined by these factual conclusions drawn by the state court.

2. For instance, Massachusetts seems to require that, in order for evidence of potentially exculpatory third-party crimes to be intro-

### Limoli Murder Fallout Theory

DiBenedetto argues that his right to present a defense was severely compromised by the trial court's refusal to allow evidence or cross-examination concerning the alleged mob murder of Limoli and the ensuing fallout. He maintains that this was crucial on two fronts: both to showing that others had motive to kill the victims and were the most likely killers, and to showing that the immunized witness Storella was biased, in that he feared retaliation from the La Cosa Nostra if he did not testify against DiBenedetto. DiBenedetto argues, as he must in a habeas petition, that this refusal rises to the level of violating his constitutional rights, including his Sixth Amendment right to present a defense and confront witnesses against him and his Fourteenth Amendment due process rights.

### A. Compulsory Process Claim

DiBenedetto claims that his Sixth Amendment right to compulsory process was violated by the trial judge's refusal to allow him to present any evidence regarding the Limoli murder, some three and a half months prior to the murders at issue in this case, and the connection of the victims and key prosecution witness to Limoli's murder.

 We start with a statement of the federal rule. Under the Sixth Amendment

duced, the prior crimes must be very close in time to the crime charged, which is not typically required in federal cases. *Compare DiBenedetto*, 693 N.E.2d at 1012, *and Commonwealth v. Rosa*, 422 Mass. 18, 661 N.E.2d 56, 60 (1996) (crimes must be "closely connected in point of time"), *with Barone*, 114 F.3d at 1296 (crimes committed ten years prior to the crime charged admitted under federal rules), *and Holt v. United States*, 342 F.2d 163 (5th Cir.1965) (crimes committed more than six months prior to crime charged admitted under federal rules).

Compulsory Process Clause, criminal defendants generally have the right to present "competent, reliable ... exculpatory evidence." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (state rule excluding evidence concerning means by which a voluntary confession was obtained violated Sixth Amendment); *see also Chambers v. Mississippi*, 410 U.S. 284, 295–96, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (application of state hearsay rule to bar testimony regarding third party's repeated confession of crime violated defendant's Sixth Amendment rights). Nonetheless, as we pointed out in *Fortini*, the Supreme Court cases undoing state court convictions based on exclusion of evidence involve egregious situations "and the more recent decisions of the Court ... create serious doubts that the Court is interested in carrying the doctrine beyond egregious cases." 257 F.3d at 46.

 In one of its more recent cases, the Supreme Court held that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," including the state's "legitimate interest in ensuring that reliable evidence is presented," and evidentiary exclusions will not violate the constitution "so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

 DiBenedetto first offered the mob fallout theory on the basis that it tended to show that third-party culprits, not DiBenedetto and his codefendant, were guilty. Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant. *United States v. Patrick*, 248 F.3d 11, 21 (1st Cir.2001). The trial judge found the connection too attenuated, holding that the evidence tended to show the Limoli murder was committed by two men who were not in Massachusetts on the date of the Chiuchiolo–Bottari murders and there was no evidence to show the two were involved. The defense then further refined its theory, arguing that the reason Limoli was murdered—stealing from a mob member—applied just as well to Storella, whose life was spared, but who was left in the unenviable position of owing a favor to the mob. Both victims here had defied the La Cosa Nostra leadership, like Limoli, giving the mob reason to execute them. The trial court considered this to be a different motive than the one provided by Storella for the murder, but one that did not exclude DiBenedetto as the executioner. Further, the trial judge found, assuming that Limoli had been ordered executed, that there was no evidence of any such order as to these victims. And the trial judge viewed this as raising an issue that would divert the jury from the central issue.

 Whether evidence is too speculative involves a subset of other questions. Here, the state courts said the two crimes were too remote and dissimilar and so the connection was speculative.[3] We are

---

3. The Commonwealth argues that the SJC findings of remoteness and dissimilarity are either fact findings or state law determinations. Both arguments miss the point of DiBenedetto's claim. The question is not whether the SJC correctly determined the Massachusetts state law regarding cross-examination, but rather whether its application in this case violates the defendant's Sixth Amendment rights. Further, these sorts of conclusions—remoteness and similarity—are mixed questions of law and fact, which receive the same level of deference as legal

doubtful: the crimes were only three and a half months apart, showed certain commonalities of modus operandi, had one overlapping main character, and had a background chorus of the same criminal group. A trial judge could easily have decided to admit this evidence. *See Barone*, 114 F.3d at 1296 (crimes committed ten years prior to the crime charged admitted under federal rules); *Holt v. United States*, 342 F.2d 163 (5th Cir.1965) (crimes committed more than six months prior to crime charged admitted under federal rules). If those were the only objections to the evidence, then the trial judge's decision to exclude might be questionable. But there were other objections—most importantly, that the only actors in this scenario that the defense was able to actually name (the Limoli killers) could not possibly have been the killers here. And so the trial judge was left only with the murky figures of unnamed mob killers, whose existence in the shadows could possibly, but not likely, be inferred from a complicated tale of the murder of Vincent Limoli.

Further, the speculative nature is only the start of the problem. There were at least two other difficulties with allowing the Limoli murder into evidence: that evidence would disparage the victims here as bad people, deserving of death, and it would pose a real danger of distracting the jury from the case before it. The trial judge, who was better situated than we to have a feel for the evidence, thought the proposed evidence would create both these problems.

In *United States v. Levy–Cordero*, 67 F.3d 1002, 1013 (1st Cir.1995), we explained that the defendant's Sixth Amendment rights "must be weighed against countervailing public interests," which include the factors outlined by the Supreme Court in *Taylor v. Illinois*, 484 U.S. 400,

108 S.Ct. 646, 98 L.Ed.2d 798 (1988). The *Taylor* factors include "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 414–15, 108 S.Ct. 646. The trial judge's concerns here go to the truth-determining function of the trial, a valid concern under the *Taylor* test.

It is a stretch to say that the evidentiary ruling amounted to a constitutional violation. The SJC's affirmance of the trial court's ruling does not reach the level of a constitutional violation of a defendant's right to present exculpatory evidence. *See Chambers*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Pettijohn v. Hall*, 599 F.2d 476, 480–81 (1st Cir.1979). "The defendant's right to compulsory process is itself designed to vindicate the principle that the 'ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.'" *Taylor*, 484 U.S. at 411, 108 S.Ct. 646, (quoting *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). This combination of unreliability, disparagement, and the tangential nature of the evidence is sufficient to uphold the trial judge's decision against constitutional challenge. Thus, using the *Taylor* balancing factors, DiBenedetto had no right under the Sixth Amendment to present evidence concerning the victims' ties to the Limoli murder and to the mob generally.

**B.** *Cross–Examination of Storella for Bias*

We also ask whether DiBenedetto has made out a constitutional claim as to

rulings. *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir.2000).

the inability to cross-examine Storella concerning his connection to the mob. The Supreme Court has recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). "[B]ias is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *United States v. Lynn*, 856 F.2d 430, 432 (1st Cir.1988) (quoting *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982)). However, the Supreme Court has also held that the Confrontation Clause does not

> prevent[ ] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.... [T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

■ *Van Arsdall* sets forth the test for determining whether a limitation on cross-examination violates the Confrontation Clause. The first question to be asked under the *Van Arsdall* test is whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? *Id.* at 679–80, 106 S.Ct. 1431; *see also United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir.1986) (limitation on questions regarding witness's commission of two murders, giving him motive to cooperate with government, not prejudicial because cross-examination had established that he received a favorable sentencing recommendation in

exchange for testimony). The second element of the *Van Arsdall* test is whether the error was harmless beyond a reasonable doubt; if so, reversal is not warranted. *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. 1431.

Two decisions of this Court provide guidance in this case. In *Lynn*, we were confronted with the question of whether a trial court's complete foreclosure of cross-examination "into a relevant and not fully explored area" violated the defendant's Sixth Amendment rights. *Lynn*, 856 F.2d at 433–34. We held that, to meet the constitutional standard, the trial court "must ensure that the jury is provided with 'sufficient information concerning formative events to make a "discriminating appraisal" of a witness's motives and bias.'" *Id.* at 433 (quoting *Twomey*, 806 F.2d at 1140 (quoting *United States v. Campbell*, 426 F.2d 547, 550 (2d Cir. 1970))). We concluded that, "[w]hile the cross-examination ... was extensive, there were relatively few questions concerning [the witness's] continuing reasons to lie to please the government" and therefore the constitutional standard had not been met. *Id.* at 433–34.

■ However, our decision in *Lynn* must be viewed next to our decision on the habeas petition presented in *Bui v. DiPaolo*, 170 F.3d 232 (1st Cir.1999), where we held that the Confrontation Clause does not give a defendant the right to cross-examine regarding "every conceivable theory of bias." *Id.* at 242. Rather, "[t]he threshold requirement imposed by the Confrontation Clause is satisfied as long as the defendant is given a fair chance to inquire into a witness's bias." *Id.*; *see also United States v. Boylan*, 898 F.2d 230, 254 (1st Cir.1990) ("So long as a reasonably complete picture of the witness' veracity, bias, and motivation is developed, the judge enjoys power and discretion to

set appropriate boundaries."). In *Bui,* we observed that a trial judge may circumscribe cross-examination if the party is unable to lay a proper evidentiary framework; where the offer is "inherent[ly] speculative[ ]," the trial judge may "prohibit[ ] cross-examiners from mounting fishing expeditions." 170 F.3d at 244; *see also United States v. Zaccaria,* 240 F.3d 75, 82 (1st Cir.2001) (refusal to allow inquiry into witness's drug trafficking, based solely on alleged admission to defendant, did not violate Confrontation Clause because "some proof in the form of concrete facts must underlie any offering that can be accepted by a trial court as evidence"). The question here is whether the bias alleged by DiBenedetto falls more within the ambit of the *Lynn* case, or the *Bui* case. The Commonwealth argues that *Bui* controls, while DiBenedetto cites *Lynn.* The SJC held that Storella had been sufficiently cross-examined as to his credibility, based on his repeated lies to investigating authorities, and as to bias, based on his need to cooperate with the government to avoid being charged with the murder himself. *DiBenedetto,* 693 N.E.2d at 1012. However, the bias alleged by DiBenedetto is bias of a different nature—although Storella was cross-examined on bias towards the government, he was not cross-examined on bias towards a third party—namely, the La Cosa Nostra leadership. Third-party bias is a proper topic for cross-examination. *See United States v. Abel,* 469 U.S. 45, 50–52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

 Nonetheless, the defense did have the opportunity to cross-examine Storella generally as to his motivation in developing the countless variations and embellishments to his account. Both defense counsel repeatedly asked Storella what he was afraid of, or what his concern was, at the time he gave his statements to the investigating authorities. Storella repeatedly answered that he was afraid of being charged with conspiracy to murder, never once indicating that he was concerned with breaking the La Cosa Nostra code of silence or otherwise angering the mob. Storella also testified under cross-examination that he was afraid of Bottari and Chiuchiolo because of their connections to "a few known figures" in the North End, indicating that, at least in his view, these two were not on the outs with the La Cosa Nostra leadership. Like the voir dire in the *Bui* case, Storella's responses to the general cross-examination questions indicate that Storella was not likely to provide the defendant with the answers he was seeking through more specific cross-examination on the Limoli murder. Based on the extensive questioning by the two defense attorneys regarding Storella's motives and credibility, and the speculative nature of the proffered line of inquiry, the trial judge did not offend DiBenedetto's Sixth Amendment rights in excluding cross-examination on the Limoli murder, even as to bias.

## V.

*Destruction of Potentially Exculpatory Evidence*

DiBenedetto's second habeas claim is that his due process rights were violated by the introduction of evidence resulting from the prosecution's testing of his sneaker, which was conducted at the start of a holiday weekend less than a week before the second trial was scheduled to begin, and which foreclosed complete testing by his own expert. There are two prongs to this claim. First, DiBenedetto argues that the testing and introduction of the sneakers as evidence violated the Pre–Trial Report, which required that the prosecution give the defense notice of any testing and an opportunity to examine any material evidence. He alleges the contravention of the Pre–Trial Report constitutes a due process violation. Second, he claims that the sneakers were exculpatory evidence,

which the prosecution had a duty to preserve. The arguments concerning the sneakers are weak and it is difficult to imagine the sneaker evidence played much of a role in the jury's determination.

The sneakers were seized by the police four days after the murder. The lawyer Schindler, in testimony the jury could have discounted, said he saw the brand name symbol on the sneakers of one of the murderers from his third floor window on that dark night. His testimony tied the sneakers to the event. The sneakers showed no visible signs of blood, itself surprising given the number of times the victims were shot at close range. When the prosecution tested the sneakers, it found a spot on the left sneaker, but not the right. When the defense tested the shoes a week later, it found a spot on the right sneaker, but not the left. The prosecution's expert testified this was not surprising as to the left sneaker, as its swab test on the left sneaker had removed the spot. This removal of the stain gives rise to DiBenedetto's destruction of evidence claim. The SJC rejected this claim, finding that DiBenedetto had failed to demonstrate prejudice, as there was "little doubt that one or both the . . . sneakers tested positive." *DiBenedetto,* 693 N.E.2d at 1011.

### A. *Violation of Pre–Trial Order*

 DiBenedetto's claim that the violation of the pretrial procedures violates his constitutional right to due process has little merit. The SJC held that, although "[t]here is no doubt that the Commonwealth failed to comply with the pretrial conference report," it was immaterial as there was no prejudice to DiBenedetto. *Id.* at 1011. Violations of state procedural rules will not constitute a federal due process violation unless they violate fundamental notions of fairness. *See, e.g., Brown v. Maloney,* 267 F.3d 36 (1st Cir. 2001); *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). Given the ques-

tionable evidentiary value of the sneaker for either the defense or the prosecution, neither the testing nor introduction of the evidence creates a situation of fundamental unfairness, no matter how unsavory the prosecution's tactics.

### B. *Exculpatory Evidence*

 The second aspect of DiBenedetto's claim, based on the destruction of potentially exculpatory evidence, is controlled by clearly established federal law, set forth by the Supreme Court in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). In *Youngblood,* the Supreme Court held that the police's failure to preserve potentially exculpatory semen evidence in a rape case was not a due process violation unless the police had acted in bad faith. 488 U.S. at 337–38, 109 S.Ct. 633. Nonetheless, simple good faith is not a complete exoneration. *See United States v. Alston,* 112 F.3d 32, 35 (1st Cir. 1997) ("We are not prepared to say that the government's 'good faith' is always and everywhere a complete defense to a due process claim where the government deliberately alters evidence that might otherwise have exculpated the defendant.").

DiBenedetto argues that the prosecution's last minute testing of the sneakers, without notice to the defense and in apparent contradiction of its pretrial report, is evidence of bad faith. We need not decide whether this meets the "bad faith" standard, because a closer look at the Supreme Court decision in *Trombetta* indicates that DiBenedetto's due process claim falls short in other regards.

 The rule established in *Trombetta* was that, in order to warrant reversal, destroyed "evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and must also be of such a nature that the defendant

would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 479–80, 104 S.Ct. 2528. The defendant claims that the sneaker's lack of blood was clearly exculpatory because it was highly unlikely that he could have shot the victims multiple times at close range without soiling his sneakers. However, given that the sneaker tested positive for blood or other organic matter, it ceased to be clearly exculpatory. Moreover, the defendant was free to cross-examine the prosecution's expert on the lack of any blood stains visible to the naked eye, which goes more to the heart of the potentially exculpatory nature of the sneakers.

Further, the *Trombetta* court, in holding that the results of a breath-analysis blood alcohol test could be introduced at trial even if the breath samples were not preserved, noted that the "evidence to be presented at trial was not the breath itself but rather the [test] results obtained from the breath samples," which the defendants could have attempted to impeach by challenging the calibration and overall reliability of the instrument. *Id.* at 488, 490, 104 S.Ct. 2528. Similarly, in this case, the evidence to be presented was not the spot itself, but rather the test results, which the defendant was free to impeach by questioning the expert about the test methodology, the inconsistent results, and, most importantly, about the test's inability to conclude that the spot was even human blood. There was no constitutional violation.

## VI.

*Conclusion*

The district court's denial of DiBenedetto's petition for habeas corpus is *affirmed.*

Gary WALTON, Plaintiff,
Appellant/Cross–
Appellee,

v.

NALCO CHEMICAL COMPANY,
Defendant, Appellee/Cross–
Appellant.

Gary Walton, Plaintiff,
Appellant/Cross–
Appellee,

v.

Nalco Chemical Company, Defendant,
Appellee/Cross–Appellant.

Gary Walton, Plaintiff,
Appellant/Cross–
Appellee,

v.

Nalco Chemical Company, Defendant,
Appellee/Cross–Appellant.

Nos. 00–1988, 00–2102, 00–2196.

United States Court of Appeals,
First Circuit.

Heard June 6, 2001.

Decided Nov. 28, 2001.

Daniel G. Lilley, with whom Daniel G. Lilley Law Offices, P.A. was on brief for plaintiff, appellant.

James B. Haddow, with whom Petruccelli & Martin, LLP was on brief for defendant, appellee.

Before TORRUELLA, Circuit Judge, CYR, Senior Circuit Judge, and LYNCH, Circuit Judge.

CYR, Senior Circuit Judge.

Plaintiff Gary Walton challenges various rulings which led the district court to dismiss his state-law claim for intentional infliction of emotional distress against his former employer, Nalco Chemical Company (Nalco), and to disallow his motion to amend the complaint to include a defamation claim under Maine law.

In its cross-appeal, Nalco challenges various evidentiary rulings, as well as the denial of its motion to dismiss Walton's pendant state-law age-discrimination claim under the Maine Human Rights Act ("MHRA"). We affirm the district court judgment.

## I

### BACKGROUND[1]

In 1977, Walton joined the staff at Nutmeg Technologies, Inc. ("Nutmeg"), selling water treatment chemicals and supplies to

---

1. All relevant facts are related in the light most favorable to Walton. *See White v. N.H. Dep't of Corrections*, 221 F.3d 254, 259 (1st Cir.2000) (judgment-as-a-matter-of-law rulings are reviewed *de novo*, whereas the evidence and inferences to be drawn therefrom are viewed in the light most favorable to the nonmoving party).

industrial and institutional customers in Maine. Between 1977 and 1994, his annual sales increased from $223,000 to more than $1,000,000. By the time Diversey Water Technologies, a Nalco subsidiary, announced its intention to acquire Nutmeg in October 1996, Walton then sixty years of age, was earning $61,000 a year as Nutmeg's highest paid Maine salesman.[2]

Prior to the time Nutmeg was actually acquired by Nalco, Walton had explained to Nalco Vice–Presidents Peter Hallson and Kenneth Yankowski that he wanted to retain his sales accounts and intended to continue working until at least age sixty-five. After Hallson and Yankowski acceded to his demands, Walton entered into an agreement not to compete with Nalco within his current sales territory for a period of eighteen months following any termination of his employment with Nalco. Whereupon Nalco agreed to disburse $5,500 to Walton as a retention bonus, provided that Walton remained employed by Nalco as of September 30, 1997.

In June 1997, however, Walton learned that Nalco had reassigned some of his sales accounts, including the third largest, to Troy Malbon, a thirty-one-year-old salesman previously supervised by Walton. On August 20, 1997, Walton met with Yankowski and Joseph Carney, Walton's direct supervisor, at their request. Yankowski inquired into Walton's financial condition, including the value of his residence and personal property, then announced that all of Walton's remaining sales accounts would be transferred to Malbon, effective January 1998. Finally, Yankowski related two anecdotes about former Nalco employ-

ees who had been demoted or discharged at age sixty-two, explaining that Nalco had forced one of them to accept early retirement.

At the same time, Yankowski advised Walton that Nalco was not prepared to offer him any early-retirement incentive, suggesting instead that Walton accept part-time employment at $20,000 per year—less than one-third his salary at the time. Walton regarded Yankowski's remarks as warnings designed to compel him to accept early retirement. In due course, Walton retained counsel, who informed Nalco on October 3, 1997, that it had engaged in age discrimination. On October 8, 1997, Yankowski and Carney instructed Walton to bring additional information regarding his financial condition, so that his minimum financial needs could be calculated by Nalco with a possible view to tendering him a buy-out offer.[3]

At Yankowski's direction, during another meeting in November 1997, Walton was required to submit to an employee evaluation pursuant to a so-called Personnel Regeneration Form; Walton tested deficient in thirteen of its fifteen categories. Walton declined to sign the written evaluation and rejected the proffered employment contract,[4] after informing Nalco Vice–President Richard Murphy, in writing, that he would not sign the new contract unless Nalco first met with his attorney to discuss the age-discrimination claims. During this period, Walton experienced emotional distress and even fantasized about suicide. In February 1998, Walton was discharged

**2.** Since Nalco acquired direct control of Diversey in December 1997, we simply refer to "Nalco."

**3.** Around the same time, Yankowski stated in the presence of Ray Field, another Nalco employee: "We can't have a man [Walton] in his

sixties sitting on his accounts coasting. We need to get a young rep in there selling business."

**4.** All Diversey employees were tendered new contracts at the time the two firms merged.

for refusing to sign the new employment contract tendered by Nalco.

The day after Walton's discharge, a Nalco employee came to the Walton home to reclaim a piece of testing equipment and the company car. After rebuffing Walton's request that he be allowed to retain the testing equipment for its "sentimental value," the Nalco employee repossessed both the testing equipment and the company car in the presence of Walton's family and neighbors. Less than sixty days passed before Walton was hired by a Nalco competitor and assigned to one of his former Maine sales districts.

Walton instituted suit in the United States District Court for the District of Maine, claiming violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and the fair employment provisions of the MHRA, Me. Rev.Stat. Ann. tit. 5, § 4571 *et seq.,* as well as intentional infliction of emotional distress. Nalco counterclaimed that Walton had breached the noncompetition agreement by accepting employment with a Nalco competitor. In due course, the district court denied Walton's motion to amend the complaint to include a defamation claim, granted partial summary judgment to Nalco on the issue of Walton's liability under the counterclaim, and reserved for trial the issue of damages under the counterclaim.

At trial, Nalco's counterclaim was dismissed after all its evidence on damages had been excluded. The district court entered judgment as a matter of law for Nalco on the Walton state-law claim for intentional infliction of emotional distress. At the conclusion of the trial, the jury returned verdicts on the ADEA and MHRA claims, awarding Walton $57,872 in back pay, $250,000 for pain and suffering,

and $1,250,000 in punitive damages. The district court reduced the total jury award to $357,872, consistent with the limitations prescribed in the ADEA and the MHRA.

## II

### *DISCUSSION*

#### A. *The Walton Appeal*

##### 1. *The Intentional Infliction of Emotional Distress Claim*

■ Walton first contends that there was enough evidence to establish that Nalco intended to inflict emotional distress by discharging him. Judgments entered as a matter of law are reviewed *de novo,* and will be affirmed "only if, after scrutinizing the proof and inferences derivable therefrom in the light most hospitable to [Walton], we determine that a reasonable factfinder could have reached but one conclusion: that [Nalco] w[as] entitled to judgment." *Fleet Nat'l Bank v. Anchor Media Television, Inc.,* 45 F.3d 546, 552 (1st Cir.1995).[5]

■ Walton had the burden to prove that

(1) [Nalco] intentionally or recklessly inflicted severe emotional distress or was certain that such distress would result from [its] conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) [Nalco's] actions ... caused [his] emotional distress; and (4) the emotional distress ... was so severe that no reasonable [person] could be expected to endure it.

**5.** As we conclude that there was insufficient evidence to support the "intentional infliction" claim, *see infra,* we need not discuss an

alternative basis for its dismissal, *viz.,* that the MHRA preempts all claims for employment-related emotional distress.

*Vogt v. Churchill,* 679 A.2d 522, 524 (Me. 1996) (internal citations and quotation marks omitted). Moreover, it was necessary for the district court, in its "gatekeeper" role, to determine, in the first instance, "'whether [Nalco's] conduct may reasonably be regarded as so extreme and outrageous [as] to permit recovery.'" *Champagne v. Mid–Maine Med. Ctr.,* 711 A.2d 842, 847 (Me.1998) (citation omitted).

■ Walton insists that the evidence demonstrated the requisite "extreme and outrageous" conduct, in that Nalco (i) abused its position of authority, *qua* employer; (ii) threatened his livelihood and professional reputation by attempting to pressure him to accept a buy-out package; and (iii) subjected him to undue "humiliation" by, *inter alia,* transferring his sales accounts to a less experienced employee, promulgating a false and demeaning job-performance review, and repossessing company property from him in the presence of his family and neighbors.

The district court correctly ruled that Walton's claim [6] should be dismissed because the evidence failed, as a matter of Maine law,[7] to demonstrate an intentional infliction of emotional distress.

### 2. The Motion to Amend

■ Walton next contends that the district court erred in denying, as untimely, his motions to amend his complaint—made immediately before and after trial—to include a defamation claim under Maine law. *See* Fed.R.Civ.P. 15(a), (b). We review only for abuse of discretion. *See Kemper Ins. Cos. v. Fed. Express Corp.,* 252 F.3d 509, 512 (1st Cir.2001); *Quaker State Oil Ref. Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1517 (1st Cir.1989) (trial court considering proposed amendment must "examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations"). Although "leave [to amend] shall be freely given when justice so requires[,]" Fed.R.Civ.P. 15(a), "parties seeking the benefit of ... [Rule 15(a)'s] liberality [must] exercise due diligence; unseemly delay, in combination with other factors, may warrant denial of a suggested amendment." *Quaker State,* 884 F.2d at 1517 (amendments may be foreclosed where movant's delay is "extreme" or unexplained).

■ The first motion to amend the Walton complaint was submitted eight months after the due date prescribed in the sched-

---

6. *See, e.g., Staples v. Bangor Hydro–Elec. Co.,* 561 A.2d 499, 501 (Me.1989) (holding that supervisor, who humiliated employee during staff meetings, demoted him without cause, and falsely accused him of professional incompetence, had not engaged in "extreme and outrageous" conduct); *see also Green v. Me. Sch. Admin. Dist. No. 77,* 52 F.Supp.2d 98, 114 (D.Me.1999) (noting that denial of tenure to teacher, though arguably violative of the retaliation provision in the MHRA, was not "extreme and outrageous"); *Krennerich v. Town of Bristol,* 943 F.Supp. 1345, 1356–57 (D.Me.1996) (observing that an intentional-infliction claim, relying solely on wrongful termination in violation of municipal employee's due process rights, failed to meet "extreme and outrageous" standard).

7. The cases Walton cites are factually inapposite and inconclusive. Two cases involved elderly parents' claims that their children had engaged in inhumane attempts to evict them from the family home after the title to the home had been conveyed to the children by the parents. *See Moulton v. Moulton,* 707 A.2d 74, 76 (Me.1998); *Latremore v. Latremore,* 584 A.2d 626, 630 (Me.1990). Such extreme conduct within a family plainly entailed the infliction of much greater emotional distress than that involved in the instant employer-employee relationship. The third case cited by Walton involved an ex-husband's unrelenting, seven-month campaign to have his former spouse's divorce attorney brought up on professional misconduct charges, and the placement of local newspaper ads publicizing those unfounded charges. *See Vogt,* 679 A.2d at 524.

uling order, six months after discovery closed, and one week prior to the trial date initially established by the district court.[8] Yet Walton offered neither an explanation nor a justification for the inordinate delays, relying instead on the naked assertion that Nalco could not have been prejudiced.

Walton nonetheless insists that his post-trial motion to conform the complaint to the evidence is distinguishable, in that Nalco implicitly consented to the trial of his defamation claim. By way of example, Walton points to evidence that Nalco personnel falsely represented that he was incompetent, and contends that falsity is an element of his defamation claim. His characterization misses the mark.

"'Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is *relevant only to that issue.*'" *United States v. Davis*, 261 F.3d 1, 59–60 (1st Cir.2001) (emphasis in original; citation omitted). In the present case, however, where evidence of the alleged falsifications by Nalco representatives was independently material to establish pretext on the Walton age-discrimination claims under the ADEA and MHRA, the district court did not abuse its discretion by denying Walton's amendatory motions.

### B. *The Nalco Cross–Appeal*

#### 1. *Proof of the Maine Human Rights Commission Charge*

The cross-appeal is predicated on the contention that Nalco was entitled to judgment as a matter of law, on the MHRA age-discrimination claim brought by Walton, because Maine law allows neither damages nor attorney fees unless the plaintiff "alleges and establishes" that the MHRC has taken final action on the administrative charge or issued a right-to-sue letter. *See* Me.Rev.Stat. Ann. tit. 5, § 4622(1)(C); *see also Gordan v. Cummings*, 756 A.2d 942, 944–45 (Me.2000).[9] The district court ruled that Nalco waived its contention by (i) failing to raise it, either in its answer or as an affirmative defense, and (ii) engaging in "trial by ambush" by withholding its objection until the close of Walton's evidence.

The Maine Supreme Judicial Court ("SJC") has yet to determine the proper allocation of burdens of proof under section 4622. Consequently, we must make "an informed prophecy of what the [SJC] would do in the same situation," seeking "guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir.1996). We review statutory interpretations *de novo*. *See Laaman v. Warden, N.H. State Prison*, 238 F.3d 14, 16 (1st Cir.2001).

Section 4622, by its plain language, precludes any characterization of the MHRC exhaustion issue as a mere affirmative defense,[10] since it explicitly states that the

8. *Cf., e.g., Jordan v. Hawker Dayton Corp.*, 62 F.3d 29, 33 (1st Cir.1995) (no abuse of discretion where amendment was filed four months after scheduling order deadline and a few days prior to close of discovery); *Quaker State*, 884 F.2d at 1517–18 (motion to amend filed within three weeks of deadline for filing summary judgment motions held untimely where "[t]he facts upon which the proposed

[amendment] rested were known to [the movant] all along").

9. The Nalco cross-appeal, if successful, would reduce Walton's net recovery from $357,872 to $115,744, the maximum allowable under the ADEA. *See* 29 U.S.C. §§ 216, 626(b).

10. Walton's citations to case law holding that various statutory limits on damages are affir-

plaintiff, rather than the defendant, must "plead[ ]" the requisite MHRC filing. *Cf.* Fed.R.Civ.P. 8.[11] On the other hand, the section 4622 requirement, strictly speaking, is not an element of the statutory age-discrimination claim, since it does not preclude a jury finding of discrimination, but merely limits the types of recovery available to prevailing plaintiffs.[12]

Since section 4622 more closely resembles a condition precedent, *cf. Jensen v. Frank,* 912 F.2d 517, 520 (1st Cir.1990) (noting that Title VII exhaustion requirement is "condition precedent" to suit); *MHRC v. Local 1361, UPIU AFL–CIO,* 383 A.2d 369, 375 (Me.1978) (observing that Title VII case law may provide guidance in interpreting MHRA), it is governed by Fed.R.Civ.P. 9(c), *see* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1302, (2d ed. 1987) ("[Rule 9(c) ] is applicable in all actions in the federal courts, even when the pleading practice in the state in which the court is sitting is different.").

Federal Rule of Civil Procedure 9(c) provides as follows:

In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity, but when so made the party pleading the performance or occurrence has the burden of proving it.[13]

Fed.R.Civ.P. 9(c). "Rule 9(c) has the effect of forcing defendant to raise the issue [of noncompliance with a condition precedent] whenever he believes there actually is a question about performance." 5 *Wright & Miller* § 1304; *id.* § 1302 ("Rule 9(c) is designed to eliminate the detailed and largely unnecessary averments that resulted under common law procedure, and to prevent nonmeritorious dismissals for failure to plead the fulfillment of conditions precedent that are not at issue in the suit.").

▮ As we have noted, *supra,* section 4622 explicitly requires that the plaintiff plead the requisite MHRC filing. Consequently, provided the complaint includes a general averment that all conditions precedent to suit or recovery have been met, and the "defendant does not deny the satisfaction of the preconditions specifically and with particularity, then the plaintiff's allegations are assumed admitted, and the defendant cannot later assert that a condition precedent has not been met." *Jackson v. Seaboard Coast Line R.R. Co.,* 678

mative defenses, which may be waived unless pleaded, are inapposite. *See Jakobsen v. Mass. Port Auth.,* 520 F.2d 810, 813 (1st Cir. 1975). Unlike section 4622, statutory "caps" on damages do not depend upon any pre-suit conduct by the plaintiff, but merely delimit arbitrarily the maximum exposure to damages for any defendant.

11. As the section 4622 requirement is nonjurisdictional, it may be waived. *Cf. O'Rourke v. City of Providence,* 235 F.3d 713, 725 (1st Cir.2001) (noting that Title VII exhaustion requirement is nonjurisdictional). Here, however, the issue is *whether* Nalco waived the requirement.

12. If section 4622 were an element of an MRHA claim, arguably Nalco could have delayed, until the close of Walton's evidence, before moving for a Rule 12(b)(6) dismissal, which may even be raised for the first time at trial. *See* Fed.R.Civ.P. 8 & 12(h)(2).

13. Rule 9(c) governs not only contractual conditions precedent, but statutory conditions precedent as well, such as section 4622. *See* 5 *Wright & Miller* § 1303 n.1; *see also, e.g., Weir v. United States,* 310 F.2d 149, 155 (8th Cir.1962); *cf. Vasys v. Metro. Dist. Comm'n,* 387 Mass. 51, 438 N.E.2d 836, 840 n. 4 (1982).

F.2d 992, 1010 (11th Cir.1982).[14]

Accordingly, the appropriate inquiry in the present case is whether either the original or amended complaint included an *adequate* "general averment" that Walton had met all conditions precedent to the recovery of damages under the MHRA, even though neither complaint explicitly alleged that Walton had filed an MHRC charge. The original complaint alleged that Walton had satisfied "all conditions precedent to jurisdiction under the ADEA," including the timely filing of a discrimination charge with the EEOC. Moreover, Count 1—the ADEA claim— alleged "damages, including, but not limited to loss of income, loss of benefits, liquidated damages, attorneys' fees, costs, prejudgment interest, and declaratory and injunctive relief." Further, the prayer for relief in Count 1 demanded "all available remedies under the Maine Human Rights Act including reinstatement, back pay and penal damages ... [and] such other relief

and further relief as the Court deems just and proper."

Finally, the amended complaint made crystal clear that Count 1 of the original complaint had been brought under *both the ADEA and the MHRA* and that Walton was demanding *"damages,* including, but not limited to, loss of income, loss of benefits, liquidated damages, attorneys' fees, costs, prejudgment interest, and declaratory and injunctive relief." (Emphasis added.) Yet Nalco neither opposed the motion to amend the complaint, nor submitted an amended answer.[15]

■■■ Under the liberal "notice pleading" standards, *see* Fed.R.Civ.P. 8(e)(1) & (f), these original and amended complaints met the "general averment" requirements prescribed by Rule 9(c). Although the complaints neither explicitly alleged compliance with all preconditions to recovery under the MHRA, nor with the requirement that an MHRC charge be filed, such compliance was plainly implicit. *Cf., e.g.,*

14. Some courts have held that where a plaintiff utterly fails to plead a general averment, the defendant need not assert "failure of performance" as an affirmative defense in order to preserve the issue, but instead may raise the issue for the first time at trial. *See* 5 *Wright & Miller* § 1304; *see also* 2 James W. Moore, *Moore's Federal Practice* § 9.04[1] (3d ed. 1997) ("Neither Rule 9(c) nor Rule 8(a)(2) expressly requires that the performance or occurrence of conditions precedent be pled at all by a claimant.").

15. At trial, Nalco maintained that it had preserved its objection by pleading, in its original answer, the general defense of "failure to state a claim" pursuant to Rule 12(b)(6). *See* Fed.R.Civ.P. 12(b)(6). Absent any indication of the case-specific basis for the objection, however, its Rule 12(b)(6) objection was insufficient to place a condition precedent, such as section 4622, in issue. *See EEOC v. Standard Forge & Axle Co.,* 496 F.2d 1392, 1395 (5th Cir.1974) (noting that, where Title VII claimant carried burden under Rule 9(c), with general averment that "all conditions precedent to the institution of this lawsuit have been fulfilled[,]" defendant was not entitled to

dismissal for want of more definite statement, pursuant to Rule 12(e), since defendant never denied plaintiff's satisfaction of conditions precedent, "specifically and with particularity"); *Vasys,* 438 N.E.2d at 840 n. 5 ("A bare allegation, in a responsive pleading, that the complaint fails to state a claim upon which relief can be granted (as was made by the defendant in its answer) would not be sufficient to preserve a claim" that plaintiff failed to satisfy a condition precedent.); *see also Brooks v. Monroe Sys. for Bus., Inc.,* 873 F.2d 202, 205 (8th Cir.1989) ("[M]ere assertion [in answer] of 'failure to state a claim' was not specific enough to [preserve] the issue" as to whether plaintiff failed to file an EEOC charge.); *see also* 5 *Wright & Miller* § 1304 ("A party who intends to controvert the claimant's general allegation of performance [of a condition precedent] thus is given the burden of identifying those conditions he believes are unfulfilled and wishes to put into issue; he cannot raise an issue of nonperformance by a general denial or by asserting that the plaintiff has failed to state a claim for relief.").

*Kiernan v. Zurich Cos.*, 150 F.3d 1120, 1123 (9th Cir.1998) (holding it sufficient to satisfy "the loose guidelines of Rule 9(c)" that plaintiff allege that insurance policy was in "full force and effect," thus by implication that all conditions precedent to valid policy were met).

First, Walton alleged that he had filed an EEOC charge. Second, it is common practice to file simultaneous EEOC and MHRC charges. Furthermore, by explicitly demanding *MHRA damages*, both in the original and amended complaints, Walton plainly placed Nalco on reasonable notice that he was claiming compliance with section 4622. Indeed, at trial Nalco's counsel acknowledged: "I'll be candid to say I did not have in mind this [affirmative defense] when I drafted the answer." [16] Consequently, the parties proceeded to trial with no hint whatsoever that section 4622 compliance was in dispute. Accordingly, the district court correctly rejected the motion for judgment as a matter of law on the MHRA claim.

### 1. *The Age–Discrimination Claim Evidence*

■■■■■ Nalco contends that the evidence was insufficient to support the jury verdicts on the ADEA and MHRA claims. We review these Rule 50 motions *de novo*, drawing all reasonable inferences in favor of the prevailing party. *See Negron v. Caleb Brett U.S.A., Inc.*, 212 F.3d 666, 668 (1st Cir.2000). We must affirm unless the evidence was "so strongly and overwhelmingly" inconsistent with the verdicts that no reasonable jury could have returned them. *See id.*(citation omitted). This demanding standard was not met.

■■■ Nalco contends that Walton was discharged due to his refusal to sign the employment agreement tendered to him, and that his age was immaterial. The record evidence nonetheless reasonably permitted a contrary inference. Walton adduced competent evidence that Vice–President Yankowski, who attempted to intimidate Walton into accepting early retirement, had related several anecdotes regarding former employees of Walton's vintage who had been forced into early retirement by Nalco. More particularly, Yankowski stated to another Nalco employee: "We can't have a man in his sixties [*viz.*, Walton] sitting on his accounts coasting. We need to get a young rep in there selling business." Walton thus presented competent evidence of an age-based animus by a Nalco decisionmaker. *See Kirk v. Hitchcock Clinic*, 261 F.3d 75, 79 (1st Cir.2001) (noting that direct evidence of discriminatory animus may consist of " 'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision' ") (citation omitted).

Moreover, Walton adduced evidence that Nalco maneuvered to establish a pretextual basis for discharging him. *See Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir.2000) (noting that pretext may be established with evidence that "nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action"). After Nalco received a letter, from Walton's attorney, claiming age discrimination, Joseph Carney, Walton's direct supervisor, administered the so-called

---

**16.** In addition, there is no serious dispute that Walton received a right-to-sue letter from the MHRC, as a copy was attached to his opposition. Accordingly, the Nalco cross-appeal reduces to the technical contentions that the letter was neither authenticated nor introduced in evidence. Thus, there was no substantial contention that Walton *in fact* failed to comply with section 4622. *Cf. Harris v. Int'l Paper Co.*, 765 F.Supp. 1509, 1525 (D.Me.1991) ("Civil penalties are not available in this case because Plaintiffs *failed to file* a complaint with the MHRC before bringing suit in this Court.") (emphasis added).

Personnel Regeneration Form to Walton at Yankowski's direction, which purported to show that Walton was *not* a competent salesman. At trial, however, Walton adduced compelling evidence of his competence as a salesman, evidence Nalco conveniently excluded from consideration in its final evaluation. For example, Nalco never received a client complaint regarding Walton's work performance. Moreover, Walton had long been the "highest grossing" salesman in his territory, and consistently enjoyed exceptional customer loyalty as evidenced by the fact that he had *never* lost a client in more than twenty years. Furthermore, his supervisor testified that Walton was "outstanding at building relationships with his customers." Additionally, rather than demonstrating laxity in developing new business, the sales volume generated by Walton increased by 92% *even as Nalco was transferring 20% of Walton's client accounts to Malbon,* his designated replacement. Moreover, even though the performance evaluation prepared by Nalco assigned Walton a "deficient" rating in regard to producing a business plan, it omitted mention that Walton already had been excluded from Nalco meetings at which new sales prospects were divided amongst his fellow sales associates. In addition, though Walton was rated "deficient" in recordkeeping, Nalco adduced no sales reports supporting its assessment.

Finally, given the record evidence before it, the jury reasonably could have found that Nalco orchestrated the Personnel Regeneration Form as pretextual support for its age-based decision to discharge Walton. *See Santiago–Ramos,* 217 F.3d at 56 (noting that memo setting forth legitimate grounds for discharging employee, prepared *after* it became apparent that former employee was initiating litigation, could be considered "pretextual post hoc justifications because [grounds] were only provided in anticipation of litigation").

## 2. Admission of Age-related Remark by Yankowski

Nalco contends that the Yankowski statement—"[w]e can't have a man in his sixties sitting on his accounts coasting . . . . [w]e need to get a young rep in there selling new business"—was irrelevant to the issue of age animus, because Walton did not prove that Yankowski played any decisionmaking role in the discharge.[17]

 Evidentiary rulings are reviewed for abuse of discretion. *Invest Almaz v. Temple–Inland Forest Prods. Corp.,* 243 F.3d 57, 69 (1st Cir.2001). Evidence that discriminatory remarks were made by persons in a position to influence the challenged employment action may suffice to establish pretext. *See, e.g., Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 35 (1st Cir.2001). The jury was entitled to disbelieve the trial testimony that Richard Murphy unilaterally discharged Walton without consultation or input from Yankowski, who was one of Walton's superiors and the vice president for Nalco's eastern sales division. *See Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 60–61 (1st Cir.2000). Yankowski initiated not only the conversations regarding Walton's retirement plans, but also the telltale age-related anecdotes. Moreover, when Walton's attorney advised Yankowski of the age-discrimination claims, it was Yankowski who directed Carney to administer the so-called Personnel Regeneration Form to Walton, *see supra,* whose grossly inaccurate results strongly suggested a pretextual basis for the Walton discharge. Three months after the Personnel Regen-

---

17. By failing to renew its motion in limine at trial, Nalco waived its contention that the challenged testimony was unduly prejudicial, hence excludable under Federal Rule of Evidence 403. *See O'Rourke v. City of Providence,* 235 F.3d 713, 727 (1st Cir.2001).

eration Form was administered to Walton, his employment was terminated.

■ The jury reasonably could have inferred, without difficulty, that Yankowski played a pivotal role in the termination decision implemented by Vice–President Murphy, and that the statement Yankowski made to Ray Field, *see supra* note 3, was both directly related and temporally proximate to the challenged employment action. *See Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 583 (1st Cir. 1999) (observing that comment by decisionmaker—"I don't have to hire you locals or Cape Verdean people"—was not mere "stray remark" where employer refused to rehire people of Cape Verdean descent).[18] The district court did not abuse its discretion by admitting the Yankowski testimony.

### 3. Exclusion of the "Lost Profits" Evidence

■ Finally, Nalco contends that it was an abuse of discretion for the district court to exclude the evidence it proffered in support of its counterclaim for damages, *viz.,* the profits allegedly lost due to Walton's post-discharge solicitation of former Nalco clients in violation of the noncompetition agreement. Specifically, Joseph Carney, the Nalco district sales manager for Maine, sought to tender a lay opinion as to the net profits lost by Nalco. The opinion was predicated exclusively upon Carney's lay review of *corporate* reports reflecting the *gross* profits generated by Nalco in its Maine sales district. Carney concededly possessed no personal or independent knowledge as to how the Nalco corporate data were compiled. Moreover, these corporate reports contained data pertaining exclusively to 1997, but none relating to the crucial 1998–99 period.

■ A trial court ruling excluding lay-opinion testimony is reviewed for a "clear abuse of discretion." *United States v. Vega–Figueroa,* 234 F.3d 744, 755 (1st Cir. 2000); *see* Fed.R.Evid. 701. As we have explained, Rule 701 "permits the rendering of lay opinion testimony when [it] is (a) 'rationally based upon the perception of the witness,' and (b) 'helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" *Lynch v. City of Boston,* 180 F.3d 1, 16 (1st Cir.1999) (citation omitted). "[T]he modern trend favors the admission of opinion testimony provided it is well founded on personal knowledge and susceptible to cross-examination." *Vega–Figueroa,* 234 F.3d at 755. The district court acted well within its broad discretion in excluding the Carney opinion testimony, which was based neither on personal knowledge nor apposite data.

*Affirmed.*

**KNIGHTS OF COLUMBUS, COUNCIL # 94, et al., Plaintiffs, Appellants,**

v.

**TOWN OF LEXINGTON et al., Defendants, Appellees.**

No. 01–2460.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 2001.
Decided Nov. 29, 2001.

---

**18.** Although the exact date of the Yankowski remark is unclear, it occurred in 1997. *Cf. McMillan v. Mass. SPCA,* 140 F.3d 288, 301

(1st Cir.1998) (finding that remarks made several *years* before challenged employment decision were temporally remote).

Chester Darling, with whom Robert Roughsedge and Michael Williams were on brief, for appellants.

Jordana Glasgow, with whom Daryl Lapp and Palmer & Dodge, LLP were on brief, for appellees.

Before SELYA and LIPEZ, Circuit Judges, and SINGAL,* District Judge.

SELYA, Circuit Judge.

This appeal requires us to decide whether the Town of Lexington, Massachusetts (the Town) violated the First Amendment by adopting a regulation that bans unattended structures from the historic Battle Green. The plaintiffs allege that this regulation infringes their First Amendment rights and that the Town adopted it for an improper purpose, *viz.*, to exclude the annual religious display of a crèche from the Battle Green. They also allege that, in all events, the Town's selective application of the regulation following its adoption renders it constitutionally infirm.

The district court found these charges unpersuasive and granted summary judgment in the Town's favor. We affirm: the record shows beyond hope of contradiction that the ban on unattended structures is a content-neutral restriction on the time, place, and manner of speech, narrowly tailored to achieve a significant governmental interest and framed so as to allow access to ample alternative avenues of communication. By the same token, there is no violation of the Free Exercise Clause because the regulation is a neutral law of general applicability. Lastly, the plaintiffs' claims of selective enforcement fail due to evidentiary insufficiency; the regulation was only intended to apply to private parties, and there is nothing in the record that shows preferential treatment in respect to any unattended structure erected by such a party.

## I. BACKGROUND

The situs of this controversy is the historic Battle Green (the Green)—the very place where the first battle of the Revolu-

* Of the District of Maine, sitting by designation.

tionary War occurred. Seven of the eight minutemen killed during the battle are buried there, and the Minuteman Statue— located at the apex of the Green—memorializes the American colonists who fought in the Revolutionary War. The Green is a registered historic landmark, owned and maintained by the Town.

The Town's governing legislative body is the Board of Selectmen (the Board). The Board is entrusted with suzerainty over, and protection of, the Green. In the exercise of that function, the Board from time to time promulgates rules governing the use of the Green. Historically, these rules have allowed for a wide range of public uses, including recreational activities and activities involving the expression of political, religious, and other views. The rules divide activities on the Green into three categories: (1) allowed activities, (2) forbidden activities, and (3) activities for which a permit is required. To illustrate, picnicking in small groups is allowed as a matter of right; commercial solicitation is prohibited altogether; and rallies are allowed if a permit is first obtained (but otherwise are forbidden).

For most of the twentieth century, the crèche—a figurine representation of Christ's nativity in the stable at Bethlehem—appeared on the Green for roughly six weeks each year (in late November and December). For some thirty years, the Town had erected the crèche, disassembled it, and stored the components. In or around 1973, however, two fraternal organizations—the Knights of Columbus and the Masons—assumed responsibility for these tasks.

There is evidence that the display of the crèche long has been a source of friction within the Town, and that some residents complained bitterly about its presence on the Green. For the most part, however, the regulations, insofar as they pertained to the crèche at all, seem to have been honored more in the breach than in the observance. Despite the fact that the regulations have required a permit for a religious display of this type since at least 1982, no permit ever was sought or demanded prior to the erection of the crèche in any year before 1999.

Beginning in the fall of 1998, the issue was repeatedly discussed at the Board's meetings. A group consisting of clergy and citizens with various viewpoints was formed to study the problem and suggest solutions. This committee reported to the Board on September 27, 1999. It unanimously concluded that "private citizens do have the right to have religious observances on the common land within guidelines established by the town," but suggested that a shortened display period might be a reasonable compromise. For the 1999 season, the owners of the crèche, including the Knights of Columbus, agreed to a display period of three weeks.

Subsequent to the Board's decision to allow the three-week display, it began receiving requests to allow a wide range of other religious structures on the Green for comparable periods. One group desired to place a sign near the crèche indicating some citizens' objections to its presence on public land. Other applicants requested permission for a display honoring witchcraft at Halloween and for the erection of a pyramid to honor the Egyptian Sun God Ra during the month of April. Yet another resident inquired about the possibility of erecting a Sukkah, an open hut-like structure, to commemorate the Jewish harvest festival of Sukkoth.

The minutes of the Board's meetings reveal a keen awareness that if it continued to allow a display of the crèche, many of these competing applications would have to be granted. The Board thus believed that it was on the horns of a dilemma: it

could not constitutionally pick and choose among competing applications, but granting them all likely would compromise the aesthetic and historic elements of the Green. After seeking legal advice, the Board modified the rules governing use of the Green in several ways. First, it limited permit eligibility for public expressions on the Green to active events of less than eight hours in duration. Second, it restricted displays of a ceremonial nature to those "in connection with special events and limited in duration to the period required for such events." Third, it added an explicit prohibition against "placement on the Green of any unattended structure." For ease in reference, we annex a copy of the regulation, as amended, as an appendix to this opinion.

On October 19, 2000, the Knights of Columbus and the organization's grand knight, Michael O'Sullivan (collectively, the Knights), applied for a permit to erect the crèche on the Green. The application was constructively denied, although the Board intimated that a one-day event that included the crèche would be approved.[1]

Dismayed by the new regulation and the concomitant ouster of the crèche, the Knights sued. Although they claimed abridgement of their free speech and free exercise rights, the district court refused to grant a preliminary injunction. *Knights of Columbus v. Town of Lexington*, 124 F.Supp.2d 119 (D.Mass.2000). We summarily affirmed that denial in an unpublished order.

In subsequent proceedings, the Knights attempted to show arbitrariness in the enforcement of the new regulation. They introduced evidence tending to prove that bleachers and a platform truck were left unattended on the Green for several days prior to a Patriots' Day celebration, and that an unattended podium was allowed to remain overnight around Memorial Day.

In due course, the district court granted summary judgment for the defendants (the Town and various Town hierarchs). We expedited the Knights' ensuing appeal in an effort to resolve the matter in advance of the Christmas season.

## II. STANDARD OF REVIEW

■▌ We review a grant of summary judgment de novo, examining the record in the light most favorable to the nonmovant and indulging all reasonable inferences in that party's favor. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000). We will uphold the grant of summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Here, the relevant facts are largely undisputed, so our analysis focuses on the legal question of whether either the new regulation or its application offend the First Amendment.

## III. THE FREE SPEECH CLAIM

The Free Speech Clause of the United States Constitution lies at the heart of the Knights' appeal. We organize our discussion of this claim in segments.

### A. *The Legal Framework.*

■■ The Free Speech Clause provides, in terms, that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. Amend. I. Under the aegis of the Fourteenth Amendment, this prohibition applies equally to states and their political subdivisions. *See Cantwell v. Conn.*, 310 U.S. 296, 303, 60

---

**1.** In point of fact, a Town resident was granted a permit to hold a "live" nativity scene and service on the Green on December 23, 2000.

S.Ct. 900, 84 L.Ed. 1213 (1940). Despite the uncompromising language in which this proscription is couched, it is not absolute.

■ The Supreme Court has articulated a framework for determining whether a particular regulation impermissibly infringes upon free speech rights. That framework dictates the level of judicial scrutiny that is due—and that choice, in turn, informs the nature of the restrictions on free speech that may be permissible in a public forum. *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir.2001).

■ The triage works this way. The bedrock rule is that government may not prohibit all communicative activity · in a public forum. *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Content-based prohibitions may endure—but only if they are justified by compelling state interests. *Capitol Sq. Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Accordingly, such prohibitions engender strict judicial scrutiny. *See id.* Content-neutral restrictions pose less of a threat to freedom of expression. Consequently, content-neutral restrictions on the time, place, and manner of speech trigger an intermediate type of scrutiny such that they will be upheld as long as they are "narrowly tailored to serve a significant governmental interest, and allow for reasonable alternative channels of communication." *Globe Newspaper Co. v. Beacon Hill Arch'l Comm'n*, 100 F.3d 175, 186 (1st Cir.1996).

Here, the Town's limitation of free speech on the Green is not absolute: the new regulation merely prohibits one manner of expression (unattended structures) in a particular place (the Green) at certain times (when unconnected with an event). Since the Town does not deny that the Knights have a free speech interest in exhibiting the crèche or that the Green is a public forum, the salient question is whether the restriction is content-based or content-neutral. It is to that question that we now turn.

## B. *Content–Based or Content–Neutral?*

■ To ascertain whether a regulation is content-based, an inquiring court must determine whether it regulates speech because of disagreement with the particular message that the speech conveys. *Id.* at 183. The Knights concede, as they must, that the language of the regulation is facially neutral. The ban on unattended structures is comprehensive; it does not discriminate among types of unattended structures, and certainly does not single out the crèche. Thus, the Knights' argument boils down to a plaint that the legislative history demonstrates that the regulation's primary purpose is to prevent display of the crèche.[2]

In making this argument, the Knights rely heavily on a "free exercise" case, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). There, the Supreme Court ruled that a municipal ordinance prohibiting cruelty to animals was unconstitutional because it was targeted at preventing the sacrificial rites practiced by adherents of the Santeria religion. *Id.* at 547, 113 S.Ct. 2217. But *Hialeah* is readily distinguishable because the ordinance at

**2.** The Town, citing *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), argues that we should not inquire into legislative purpose when a statute is content-neutral on its face. Here, however, both the text of the statute and the legislative history point toward neutrality, so we need not and do not decide whether such an inquiry is constitutionally required.

issue there was riddled with exceptions that effectively made it applicable only to Santeria worshipers. *See id.* at 535, 113 S.Ct. 2217. Thus, the ordinance—unlike the regulation at issue here—was not content-neutral in its operation. *See id.* For present purposes, the most that *Hialeah* teaches is that a court may have to look beyond the bare language of a regulation to determine whether its justification is content-neutral. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("[G]overnment regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech."); *D.H.L. Assocs. v. O'Gorman*, 199 F.3d 50, 57 (1st Cir.1999) (same).

In the instant case, there is nothing in the record that evinces a content-based animus against the crèche. On the contrary, the Board proposed the new regulation only after requests for permits for alternative religious displays began to sprout. Mindful of the strictures of the Establishment Clause, the Board reasonably assumed that it must treat all applications for religious displays alike, regardless of the message conveyed. Fearing a flood of applications and a corresponding cluttering of the Green, the Board devised a regulation prohibiting *all* unattended structures. This is a far·cry from an invidious singling-out of the crèche.[3]

The only inference that the record permits is that the new regulation was conceived out of a desire to treat all religious expression even-handedly. If the Knights feel that the burden of the regulation falls most heavily on them, it is perhaps because they are now held to the same standard as all other similarly situated applicants. While the adjustment may not be an easy one, the outcome is inescapably content-neutral.

## C. *Significant Governmental Interest/Narrow Tailoring.*

Having determined that the regulation is content-neutral, we now apply intermediate scrutiny to ascertain whether it is narrowly tailored to achieve a significant governmental interest. *McGuire*, 260 F.3d at 43.

The Town asserts that its interest in preserving the historical and aesthetic qualities of the Green amply justifies the restriction. This is a theoretically sound position. After all, in *Globe Newspaper*, we upheld, against a free speech challenge, a ban on news racks in a historic Boston neighborhood. 100 F.3d at 195. We recognized there that aesthetic preservation may warrant a content-neutral restriction on speech in a public forum. *Id.* at 187. As was true in *Globe Newspaper*, the Town's interest in aesthetic preservation qualifies as a significant one. Moreover, that interest is enhanced here by the site's designation as a national historic landmark.

In an attempt to blunt the force of this conclusion, the Knights argue that the regulation is not narrowly tailored to the achievement of this aesthetic rationale. They make three points: first, that it is not only unattended structures that produce clutter; second, that the Town should have pursued alternatives less restrictive than a total ban; and third, that the crèche is aesthetically pleasing. The first two

---

**3.** The Town's longstanding practice of permitting the crèche to be displayed on the Green without a permit helps, rather than hinders, the Town's argument. That practice shows a receptivity to the display and, contrary to the Knights' importunings, creates no entitlement to preferential treatment in the future.

parts of this argument are plainly misguided. The narrow tailoring requirement "does not mandate a least restrictive means analysis." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 744 (1st Cir.1995). Thus, the Town was "[not] required to implement or experiment with other alternatives before finally choosing the total ban." *Globe Newspaper*, 100 F.3d at 189 n. 15. The "narrow tailoring" requirement is satisfied as long as the particular "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Nat'l Amusements*, 43 F.3d at 744.

■ Here, moreover, the regulation appears entirely logical when one recalls that it was adopted amid a concatenation of Establishment Clause concerns. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 2103, 150 L.Ed.2d 151 (2001) (stating that avoiding an Establishment Clause violation may be a compelling state interest justifying even content-based restrictions on speech). The Town legitimately could conclude that unattended displays were more likely to present Establishment Clause issues than attended ones because, for instance, a reasonable observer might be confused as to the source of the message.[4] *Cf. Capitol Sq.*, 515 U.S. at 778–79, 115 S.Ct. 2440 (O'Connor, J., concurring). This is significant because the context of a religious display is crucial in determining its constitutionality. *Compare County of Allegheny v. ACLU*, 492 U.S. 573, 621, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (forbidding display of a crèche in a county courthouse), *with Lynch v. Donnelly*, 465 U.S. 668, 685, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (permitting inclusion of a crèche in a municipality's outdoor holiday display).

We note, too, that the Supreme Court has explicitly indicated that a total ban on unattended structures in a public forum would pass constitutional muster. In *Capitol Square*, a majority of the Justices (the plurality, plus Justices Souter and Stevens) specifically agreed that "[the state] could ban all unattended private displays" in a public forum. *Id.* at 783, 115 S.Ct. 2440 (Souter, J., concurring); *accord id.* at 761, 115 S.Ct. 2440 (plurality opinion); *id.* at 803, 115 S.Ct. 2440 (Stevens, J., dissenting). Various decisions of the courts of appeals are to like effect. *E.g., Am. Jewish Cong. v. City of Beverly Hills*, 90 F.3d 379, 384 (9th Cir.1996) ("The city constitutionally could ban all unattended private displays in its parks."); *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir.1991) (similar); *Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341, 347 (7th Cir.1990) (similar). Finding no reason why the case before us demands a different outcome, we hold that the total ban on unattended structures is both content-neutral and narrowly tailored to achieve a substantial governmental interest. It is, therefore, constitutionally permissible.

As to the Knights' claim that the crèche is aesthetically pleasing, the Establishment Clause makes clear that the Town was bound to consider a range of potential religious displays when it envisioned the future of the Green. Thus, the aesthetics of the crèche, in the abstract, are irrele-

---

**4.** Although the plurality opinion in *Capitol Square* proposed a per se rule to the effect that the government may not violate the Establishment Clause by providing a forum for private religious expression, *see Capitol Sq.*, 515 U.S. at 770, 115 S.Ct. 2440, a majority of the Justices rejected this limited abandon-ment of the endorsement analysis. *See id.* at 787, 115 S.Ct. 2440 (Souter, J., with whom O'Connor and Breyer, JJ., joined, concurring); *id.* at 799, 115 S.Ct. 2440 (Stevens, J., dissenting); *id.* at 817–18, 115 S.Ct. 2440 (Ginsburg, J., dissenting).

vant. The Town rationally could have decided that some of the requested displays, or the sheer number of potential displays, would be inconsistent with the aesthetic quality of the Green. Even if the crèche were more beautiful than all the others—a matter on which we take no view—the Town was not at liberty to allow the crèche while at the same time prohibiting other religious displays.

### D. *Alternative Avenues of Communication.*

■ As a final matter, the regulation does not unduly restrict the Knights' free speech rights because they have adequate alternative avenues of communication available to them. *See McGuire,* 260 F.3d at 43; *Globe Newspaper,* 100 F.3d at 186. The Knights remain free to display the crèche, either during the course of an event on the Green or at any time on nearby private property.[5] To be sure, the Knights argue that these are not adequate alternatives—an event would be too transitory and placing the crèche on private property would not convey the same message. But the message that they suggest is suppressed is that the crèche belongs "at the center of public life in the Town of Lexington." This resupinate reasoning turns the constitutional standard upsidedown. Although the Constitution protects private expressions of beliefs, it does not authorize—and sometimes even forbids—citizens' attempts to invoke public backing of their beliefs. The Knights have no constitutional right to communicate a message of public support for the crèche.

It is also notable that the crèche is not completely banned from the Green. Like any other ceremonial display, it may appear on the Green in conjunction with an active event for up to eight hours. The

Knights have not explained why such a display is impractical, instead stating that the Town has no right to dictate to them how they must express their private beliefs. Yet the Town has issued no general ukase regarding private religious observances; only religious displays on a single strip of public land are affected. In a forum of this kind, it has long been established that government may impose reasonable restrictions on the manner of speech. *See, e.g., Capitol Sq.,* 515 U.S. at 761, 115 S.Ct. 2440. In adopting the regulation, the Town has done no more than exercise its right to manage its property in the manner it deems desirable without crossing the constitutional line.

### E. *Consistency in Application.*

■ The Knights' next argument is that the amended regulation has been applied so inconsistently that it gives municipal officials unfettered discretion (and, thus, violates the rule announced in *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965)). In *Cox,* the Court struck down a municipal ordinance prohibiting street parades and meetings on the ground that the ordinance effectively gave local officials unbridled discretion to permit some demonstrations and disallow others. *Id.* at 557, 85 S.Ct. 453. The case stands for the proposition that a neutral ordinance may violate the First Amendment if it invites uneven application.

To demonstrate that the regulation here at issue has been enforced selectively, the Knights presented evidence of other unattended structures that have been seen on the Green since the new regulation was adopted, e.g., bleachers and a platform truck were left on the Green prior to a Patriots' Day celebration, and a podium

---

**5.** The record shows that one of the two churches facing the Green is willing to have

the crèche displayed on its front lawn for the customary six-week interval.

appeared on the Green some days prior to a Memorial Day event.

The most obvious flaw in this construct is the lack of any evidence that these structures were erected by private parties. This gap is critical because the regulation was never intended to apply to actions by the Town itself. In fact, the text of the regulation, as adopted by the Board, prohibits "[p]lacement on the Battle Green of any unattended structure *by any private party* " (emphasis supplied). Even though these last four words later were omitted from the printed regulation through an apparent clerical error, it is reasonable to interpret the regulation as applying only to private parties. In fact, the entire subsection in which the regulation resides (quoted in the Appendix) is most plausibly read as applying only to private conduct. For example, we do not believe that the provision prohibiting "removal[ ] or disturbance of any . . . monument, statue, marker, animal or plant" reasonably could be construed to prevent regular maintenance, repair, replacement, or landscaping done by the Town. Similarly, the prohibition on the use of firearms is most sensibly understood as not encompassing police officers acting in their official capacity. Because the Town is exempt from the ban on unattended structures on the Green, the Knights' claim of selective enforcement fails for evidentiary insufficiency.

## IV. THE FREE EXERCISE CLAIM

▮▮▮▮▮ The Free Exercise Clause also is made applicable to the states (and, therefore, to municipalities) through the Fourteenth Amendment. *See Cantwell,* 310 U.S. at 303, 60 S.Ct. 900. It provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]. . . ." U.S. Const. Amend. I. In interpreting this language, the Supreme Court has recognized that the exercise of religion some-

times may involve "performance (or abstention from) physical acts," and that the government may violate the right to free exercise if it seeks "to ban such acts or abstentions only when they are engaged in for religious reasons." *Employment Div., Dep't of Human Res. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Even so, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Hialeah,* 508 U.S. at 531, 113 S.Ct. 2217.

▮▮▮▮ The Knights' current reliance on this doctrine is misplaced. As we already have determined, *see supra* Part III(B), the ban on unattended structures is content-neutral in every way. For the reasons elaborated in our previous discussion, we are bound to conclude that the regulation does not discriminate against a particular religion or religious practice. *See Hennessy v. City of Melrose,* 194 F.3d 237, 244 n. 1 (1st Cir.1999) (explaining that private beliefs do not excuse a party from complying with a law of general applicability). Hence, the Knights cannot rewardingly invoke the Free Exercise Clause in their attack on the regulation.

## V. CONCLUSION

We do not live in a utopian world, and the myriad guarantees that the Constitution provides sometimes can operate in tension with one another. So it is here: the Establishment Clause pulls in the direction of separating church and state, while the Free Exercise Clause pushes in the direction of permitting the unfettered expression of religious doctrine. In our view, the Town has reconciled these competing centrifugal and centripetal forces in a constitutionally acceptable manner, holding the delicate balance steady and true. Admittedly, its solution—the banning of all

unattended structures from the village green—inhibits some speech, but the solution is content-neutral, narrowly tailored to suppress no more speech than necessary, and leaves open ample alternative avenues of communication. No more is exigible to withstand the intermediate level of scrutiny that the First Amendment imposes here.

We need go no further. We hold that the Town's ban on unattended structures on the Green is a permissible "time, place, and manner" restriction that operates without reference to the content of speech, and that the aesthetic preservation of so historic a landmark furnishes an appropriate basis for imposing this narrowly tailored restriction in a public forum. Because the challenged regulation leaves open many other means of communication for religious speech and there is no competent evidence of selective enforcement, we reject the Knights' free speech claim. On much the same analysis, we likewise reject the Knights' free exercise claim. Consequently, we hold that the lower court did not err in granting summary judgment for the defendants.

*Affirmed.*

### *Appendix*

## RULES AND SPECIFICATIONS REGULATING THE USE OF THE BATTLE GREEN

The following rules and regulations have been adopted in accordance with the General By–Law, Article XXV, Section 225, "Protection of the Battle Green", as amended. If these regulations or portions thereof, conflict with the By–Law, the By–Law shall take precedence.

### 1. DEFINITIONS

a. "Audio device" means any radio, television set, musical instrument, or other device that produces noise.

b. "Disorderly conduct" means any action intended to cause inconvenience, annoyance, or alarm, or which recklessly creates a risk thereof; fighting, threatening or violent behavior; unreasonable noise; abusive language directed toward any person present; wrestling in vicinity of others; throwing of breakable objects; throwing of stones; or spitting.

c. "Powerless flight" means any device used to carry persons or objects through the air; for example, sailplanes, gliders, balloons, body kites, hand gliders.

d. "Public use limit" means the maximum number of people or the amount, size, or type of equipment permitted on the Battle Green at one time, as established by the Board of Selectmen.

c. "Special event" means demonstrating, picketing, speechmaking, marching, holding of vigils, and all other similar forms of conduct which involve the active communication or expression of opinions or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers.

f. "Wet turf" shall mean any natural condition that would make the Green vulnerable to excessive damage by heavy wear or use; for example, heavy rains, reseeding, drought conditions.

g. "Non-permit activities" shall mean activities that may be engaged in without a permit issued by the Board of Selectmen.

## 2. NON–PERMIT ACTIVITIES

Subject to the restrictions in these rules and regulations, permits shall not be required for:

a. Conduct that does not cause public inconvenience, annoyance, or alarm.

b. Picnicking restricted to benches only and to groups of no more than five people.

Picnicking on the Green by bus tours or similar groups is forbidden.

c. The gathering of groups on the Battle Green for the sole purpose of exploring and enjoying its history, and which do not remain for more than four hours.

d. Playing of audio devices at a reasonable volume.

e. The playing of games that do not:

i. exceed three players; or

ii. damage the Green's physical condition; or

iii. disturb or inconvenience those visiting the Green for historic interest; or

iv. constitute any type of disorderly conduct.

## 3. PERMIT REQUIRED ACTIVITIES

a. The purpose for requiring permits for certain activities is to promote the use of the Battle Green in a manner consistent with its nature and history; to protect the Battle Green from harm; to ensure adequate notice of the event so that arrangements can be made to protect the public health and safety and to minimize interference with the event by the public.

b. Permits are required for any of the following activities, singly or in combination:

i. Any group activity reasonably likely to exceed the public use limit established by the Board of Selectmen.

ii. Special events, public meetings, assemblies, gatherings, demonstrations, parades, and other active public expressions of interest, not to exceed eight hours in duration.

iii. Pageants, reenactments, regattas, entertainments, or other as public spectator attractions.

iv. Displays of a ceremonial nature in connection with special events and limited in duration to the period required for such events.

v. Use of public address system, electrical lighting, or other electrical devices.

vi. Distribution of printed matter other than commercial advertising.

vii. Possession of firearms if unloaded or packed in such a way as to prevent their use.

viii. Possession of explosives, as long as individuals or groups conform to Federal, State, and local laws governing such possession.

ix. Use or possession of fireworks or firecrackers.

## 4. IMPERMISSIBLE ACTIVITIES

The following activities are strictly prohibited:

a. Any group activity that exceeds the public use limit established by the Board of Selectmen for the Battle Green.

b. Possession, destruction, injury, defacement, removal, or disturbance of any building, sign, equipment, monument, statue, marker, animal or plant.

c. Distribution or display of commercial advertising; or soliciting of busi-

ness; or any other commercial transactions.

d. Remaining on the Battle Green for more than four hours.

e. Abandonment of any vehicle or personal property.

f. Unreasonably loud operation of audio devices.

g. Delivery of any person or thing by parachute or helicopter.

h. Powerless flight activities.

i. Begging.

j. Disorderly conduct.

k. Use of firearms.

l. Use of metal detecting device for personal use.

m. Gambling of any form or operation of gambling devices.

n. Picnicking except as provided in 2b.

o. Use of roller skates and skateboards.

p. Placement of the Battle Green of any unattended structure.

### 5. PERMIT PROCESS

a. Application for permits to conduct activities on the Battle Green, specified in 3, above, shall be filed no later than two weeks prior to the requested date. Late and/or incomplete applications will be considered at the discretion of the Board of Selectmen.

b. Permit applications shall include the following information:

 i. Name and phone number of a responsible contact.

 ii. Date and time of event.

 iii. Nature of event.

 iv. Expected number of participants, spectators, and vehicles.

 v. Duration of event.

 vi. Statement of equipment and facilities to be used.

 vii. Section of the Green desired.

c. The responsible party is to keep the permit, which must be available for inspection upon request. The responsible party may be required by the Board of Selectmen, as a condition of issuing the permit, to pay for detail police officers if the Board determines that such officers are necessary for public safety.

d. Permits are issued upon express condition the Green is to be left in an orderly fashion.

e. Permits are non-transferable; and are only valid for date and time specified.

f. A permit shall be revoked if a sanctioned event engages in impermissible activities and may be revoked if the permit group engaged in activities that are not within the specification of the permit.

g. The Board of Selectmen may alter a request by setting reasonable conditions and restrictions as to duration and area occupied, as are necessary for protection of the area and public use thereof.

h. Wet turf conditions may supersede the use of a granted permit at the discretion of the Board of Selectmen to protect the condition of the Battle Green.

### 6. GROUNDS FOR DENIAL OF PERMIT REQUEST

a. Prior applications for permit for conflicting schedule has been made or will be granted.

b. Event presents a clear and present danger to public health or safety.

c. Event is of such nature or duration that it cannot reasonably be accom-

modated in the area applied for; or the expected number of participants exceeds the public use limit.

d. Event will, in the opinion of the Board of Selectmen, cause unacceptable interference with use of the Green by the general public.

e. Event is requested for a date that conflicts with official celebrations of the Town.

f. Event is more appropriately held at other available Town facilities, such as recreational facilities.

Approved by the Board of Selectmen July 15, 1986

Amended July 24, 2000